**UNITED STATES of America,**

v.

**Joseph LAVAN, Defendant,**

**No. 98 CRIM. 0098(LAK).**

United States District Court,
S.D. New York.

July 2, 1998.

---

· Lisa P. Korologos, Assistant United States Attorney, Mary Jo White, United States Attorney, New York City, for U.S.

Cary A. Bricker, Legal Aid Society, Federal Defenders Division, Brooklyn, NY, for Defendant.

## MEMORANDUM OPINION

KAPLAN, District Judge.

The Court here is asked to determine whether the warrantless entry into and search of an apartment were justified, respectively, by exigent circumstances and voluntary consent of one of the occupants. It concludes on the basis of the hearing record that the warrantless entry violated the Fourth Amendment and that the subsequent consent was tainted by that entry. As the government has demonstrated persuasively that the evidence inevitably would have been discovered absent the unlawful entry, however, the motion to suppress the articles seized in the apartment is denied.

### Facts

At approximately 1:30 p.m. on January 21, 1998, police and FBI agents responded to the scene of a reported bank robbery at the Citibank branch on Broadway near 207th Street in Manhattan. They soon learned that the bank had been held up by a man with a gun, obtained a description, and were told by at least one witness that the perpetrator had left the scene and entered an apartment building around the corner at 570 Isham Street.

Officers immediately went to 570 Isham Street and encountered a woman who told them that she worked as a health care aide for an older woman [1] who resided in apartment 5D, that she had just left that apartment, and that a man answering the description of the bank robber had entered the apartment moments before and gone into the

---

1. Counsel have described Ms. Mattai, the female resident of the apartment, as "elderly." Having observed Ms. Mattai at the hearing, the Court does not subscribe to that characterization, which it attributes to the youth of the characterizers. Ms. Mattai more properly may be described as a mature adult who appears to be in her early 60's.

bathroom to change his clothes. She further informed the officers that the man had not done so upon entering the apartment on prior occasions. Officers located the building superintendent, who informed them that a man named Joe fit the description of the bank robber and sometimes stayed in apartment 5D.[2]

Police then went to apartment 5D at about 2 p.m. or shortly thereafter and knocked on the door. A woman, whom they eventually learned was Martha Mattai, came to but refused to open the door. Thus began a stand off that lasted until the police forced their way into the apartment at approximately 8 p.m.

Over the entire six hours of the confrontation, police repeatedly banged on the door and telephoned Ms. Mattai in an effort to persuade her to open the door. They told her that they believed that Joe was in the apartment with her, which she repeatedly and falsely denied,[3] and that they could not leave until they were satisfied that she was safe. She protested that she was fine, that the officers were harassing her, and that they should leave. The officers informed her that they could not leave until they saw her and could see that she was okay.[4]

As Ms. Mattai's state of mind, particularly as it appeared to the officers, is significant here, it is important to note that the tapes of the telephone exchanges demonstrate that she was determined, shrewd and very much in possession of her faculties, although her anger and annoyance also were apparent.[5] When the officers first asked about "Joe," they mistakenly identified him as "Joe Duffy." Ms. Mattai seized on this to deny that there was any Joe Duffy in the apartment, continuing to deny that "Joe Duffy" was present even when the police specifically inquired about "Joe Lavan." Moreover, in one revealing exchange, Ms. Mattai manifested knowledge of her legal rights and insistence upon their observance:

"MARTHA: Yeah, now they're, they're banging at the door. I know. They're trying to open the door by force.

"[OFFICER]: I don't know if they're gonna do that.

"MARTHA: They're not supposed to open no door by force, you know that Tony. I know the law.

"[OFFICER]: Well they ... they may have to. You know?

"MARTHA: If they don't have a warrant they cannot do it, Tony.

"[OFFICER]: No, you know, it may be an emergency situation. It's becoming ...

"MARTHA: It's not an emergency Tony.

"[OFFICER]: It could be.

"MARTHA: Stop it, okay? You're not talking to a fool.

"[OFFICER]: I'm not saying you're a fool, Martha.

"MARTHA: I know the law."[6]

Over the hours during which these fruitless exchanges with Ms. Mattai took place, police pursued two courses in parallel. They sought to secure the apartment and obtain better information about what was going on inside, and they pursued the investigation of the bank robbery. They evacuated the apartments above, below and adjacent to 5D.

---

**2.** The government has not challenged the defendant's standing to object to the search of the apartment.

**3.** She lied also about the time of the defendant's arrival in an apparent effort to provide an alibi.

**4.** Tapes of the telephone calls between police and Ms. Mattai are in evidence. If there are tapes of the non-telephonic exchanges, they were not offered.

**5.** The defendant makes much of the fact that Ms. Mattai previously had been hospitalized in a psy-

chiatric facility for a month and of her alleged physical infirmity. The Court finds, however, that Ms. Mattai was in full possession of her faculties on the date in question. In fact, although police took her to a psychiatric facility following their entry into the apartment, Ms. Mattai was released the next day. Nor was her physical health a material factor in the events at issue here.

**6.** GX 3C, transcript at 5.

Specially trained officers used a long pole to break a window in the living room of the apartment and lowered a video camera to a point outside the broken window, thus permitting them to observe a portion of the apartment. Other officers removed the lens from the peephole in the apartment door and inserted a device that permitted them either to hear or see what was going on in the apartment's hallway. More than fifty officers and agents came to the vicinity of the apartment, surrounded the building and blocked egress from the apartment into the hallway. Nevertheless, despite the substantial number of police, high-tech equipment, and heavy weapons on the scene, the situation was not secure, even apart from the risk presented by Ms. Mattai's presence in the apartment. The apartment opened onto a fire escape, which in turn gave access to a number of occupied apartments. For safety reasons, police were not stationed on the fire escape throughout the encounter, so the armed perpetrator in the apartment might have been able to enter an occupied apartment via the fire escape and endanger the occupants or take them hostage.

The investigation, meanwhile, proceeded apace. At 3:30 or 4 p.m., law enforcement officers learned that the "Joe" believed to be in 5D was the defendant, Joseph Lavan.[7] A photograph was obtained and a photo array constructed. At about 4 p.m., two plastic bags of money were thrown from the apartment window.[8] At about 7:30 p.m., one of the witnesses to the robbery identified Lavan from the photo array as the bank robber. The detectives communicated this information to officers on the scene and to the United States Attorney's office, with which they had been in touch throughout the day.[9] An Assistant United States Attorney thereupon (1) authorized a warrantless arrest of the suspect, (2) began preparing an application for a warrant to enter and search the apartment, and (3) notified the Magistrate Judge on duty that the application would be presented as soon as it was completed.[10]

Police officers broke down the door to the apartment at approximately 8 p.m. at a point when Ms. Mattai was believed to be near the entrance. One of the officers grabbed Ms. Mattai by the arms, quickly pulled her out into the hall and thus out of harm's way, and passed her to another officer who placed her against the wall and handcuffed her behind her back. A number of officers entered the apartment through the door and from the fire escape and immediately began a protective sweep to see whether anyone else was in the apartment. They found Lavan, handcuffed him, and removed him from the apartment.

Once Lavan was out of the apartment, officers brought Ms. Mattai back into the apartment. Special Agent Hatton of the FBI approached her and began to explain that the officers were investigating the bank robbery. Ms. Mattai was quite agitated and inquired after Lavan, whom she described as her boyfriend. Hatton explained that Lavan was the subject of the bank robbery investigation and went on to say that he wanted to find out from Mattai what had happened and to obtain her consent to search the apartment. As he did so, other officers removed her handcuffs and Mattai sat down at a table and continued speaking with Hatton. She calmed down, and Hatton showed her a consent-to-search form and explained it. The government contends that Mattai gave verbal consent to the search. Mattai denies that she did so. Both sides agree that she refused to sign the consent form.

In seeking to resolve this conflict in the testimony, the Court bears very much in mind that Ms. Mattai is far from a disinterested or naive witness. She lied to police during the stand off in order to protect Lavan. Her devotion to him was evident on the witness stand. Having considered also her demeanor, that of Agent Hatton, and the content of the telephone conversations between Mattai and the police during the hours preceding the entry, the Court finds that Mattai, whatever the precise form of her words, told the officers that they could

7. Tr., 6/26/98, 59.

8. Id. 57.

9. Kelley Decl. ¶ 2.

10. Id. ¶ 3.

search the apartment but refused to sign the consent form. The United States Attorney's office was notified that consent had been obtained, whereupon the assistant who had authorized the warrantless arrest stopped preparation of the search warrant application.[11]

The officers found the items which are the subject of this motion—including a black automatic pistol with a magazine, sunglasses, and items of clothing allegedly worn by Lavan during the bank robbery—following Mattai's consent.

### Discussion

Lavan argues that the items seized in the search of the apartment should be suppressed because the search violated the Fourth Amendment to the United States Constitution. He contends that the entry into the apartment was unlawful because the police failed to obtain a warrant and that the need for a warrant was not excused by any exigent circumstances. This, he argues, requires suppression because the search, even if consented to, was fruit of the poisonous tree of the illegal entry. Finally, he asserts that any consent given by Ms. Mattai was not voluntary.

### The Entry

■ Warrantless entry into a home is presumptively unreasonable.[12] Nevertheless, "warrant requirements must yield when exigent circumstances demand that police act speedily."[13] In *United States v. MacDonald*, our circuit articulated six factors to be considered in determining whether such circumstances exist:

"(1) the gravity or violent nature of the offense with which the suspect is charged; (2) whether the suspect is reasonably believed to be armed; (3) a clear showing of probable cause ... to believe that the sus-

pect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that the suspect will escape if not swiftly apprehended; and (6) the peaceful circumstances of the entry."[14]

The *MacDonald* factors, moreover, are nonexhaustive, "illustrative guides."[15] Other circumstances may bear on whether the urgency of the situation justified the warrantless entry. The overall question is whether the entry was unreasonable within the meaning of the Fourth Amendment.[16]

■ In this case, the offense—armed bank robbery—was a serious and violent one. The officers reasonably believed that the suspect was armed. By the time the officers entered the apartment, there was strong reason to believe that Lavan was the bank robber and that he was in the apartment. The evidence at hand included a positive identification of Lavan from the photo array and the throwing of cash evidently stolen from the bank out of the apartment window. Of the *MacDonald* factors, only the lack of any reasonable possibility of complete escape by Lavan, given the overwhelming police presence, and the forced nature of the entry even arguably support the defendant.

The parties each urge circumstances not enumerated in *MacDonald* in support of their respective positions. The government contends that barricaded or hostage situations such as this are inherently volatile. There was particular danger here, it asserts, because Lavan could have used the fire escape outside apartment 5D to gain access to other occupied apartments, thus posing a risk of injury to neighbors. It points out also that it never was entirely clear whether Ms. Mattai was being held hostage or otherwise in danger. The defendant, on the other hand, contends that the six hour duration of

---

11. *Id.*

12. *E.g., Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).

13. *United States v. Fields*, 113 F.3d 313, 322 (2d Cir.) (citing *Warden v. Hayden*, 387 U.S. 294, 298–99, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967)), *cert. denied,* —— U.S. ——, 118 S.Ct. 434, 139 L.Ed.2d 334 (1997).

14. *United States v. MacDonald*, 916 F.2d 766, 769–70 (2d Cir.1990) (in banc), *cert. denied.* 498 U.S. 1119, 111 S.Ct. 1071, 112 L.Ed.2d 1177 (1991).

15. *Fields*, 113 F.3d at 322.

16. *See, e.g., Warden*, 387 U.S. at 298, 87 S.Ct. 1642.

the stand off, coupled with the lack of any specific event suggesting any increased urgency when the decision to enter was made, demonstrates that there were no exigent circumstances and that the Fourth Amendment's warrant requirement should be enforced here.

■ The Court is not prepared to accept the categorical arguments of either the government or the defendant. While hostage or barricaded situations probably often are unstable and risky, and this surely may be a factor supporting the reasonableness of an entry,[17] the evidence before the Court does not justify the conclusion that warrants never need be obtained in such circumstances. Indeed, the Supreme Court at least twice has rejected such *per se* approaches in favor of fact-specific, case-by-case inquiries as to exigency.[18] On the other hand, the duration of this confrontation, while certainly a factor cutting in the defendant's favor, is not alone sufficient to require the conclusion that the warrantless entry necessarily was unreasonable within the meaning of the Fourth Amendment.

In viewing the specific facts at bar, the government's position is a strong one. The police knew that Lavan, who had just committed a serious violent crime, was in the apartment with a gun. The fact that no one had been hurt for six hours certainly did not mean that the risk of injury had decreased. The officers arguably were entitled to believe that the situation had become more rather than less dangerous with the passage of time and the coming of night, as they reasonably could have regarded increasing fatigue and the virtually hopeless nature of Lavan's situation as likely to precipitate an effort to change the tactical situation. Importantly, police could not be stationed safely on the fire escape. They therefore could not be sure of preventing Lavan from exiting the window of the apartment, entering another apartment, and taking a hostage or hostages in an effort to escape.

On the other hand, the defendant's position also is persuasive. There was no real risk of escape. While Ms. Mattai's status—hostage or willing accomplice—had not been established definitively, the circumstances strongly suggested that she was harboring Lavan and in little or no danger. Indeed, Officer O'Neill, the ESU officer closest to the door, concluded by the time of the entry that there was a 90 to 95 percent likelihood that she was an accomplice, not a hostage.[19] Most importantly, by the time the decision to enter was made, the police had been camped outside the apartment for nearly six hours.

Certainly there was no lack of probable cause. The police knew early on that Lavan arrived in the apartment at about the same time that a witness saw the bank robber enter the building. His description matched that of the bank robber. By 4 p.m., they knew that money apparently stolen from the bank had been thrown from the window of apartment 5D. Hence, while the police did not have a positive identification of Lavan as the bank robber until about 7:30 p.m., they had probable cause to obtain a warrant, at least from the point at which they found money if not earlier.

Given the presumptive unconstitutionality of warrantless entries of private homes, it was the government's burden to prove that this entry was justified by exigent circumstances. But the government offered no evidence as to why the situation was regarded as justifying a warrantless entry at that point when no such entry had been attempted earlier. Absent some convincing evidence to the contrary, the Court is bound to conclude that the authorities could have made a telephonic application to seek evidence connecting La-

---

17. *See Tierney v. Davidson,* 133 F.3d 189, 197 (2d Cir.1998) ("combustible nature of domestic disputes" held to support reasonableness of warrantless entry).

18. *Richards v. Wisconsin,* 520 U.S. 385, 117 S.Ct. 1416, 1420–22, 137 L.Ed.2d 615 (1997) (declining to hold that law enforcement officers necessarily have reasonable cause to believe that exigent circumstances exist, justifying "no-knock"

entries, whenever a warrant issues for a search for drugs); *Mincey v. Arizona,* 437 U.S. 385, 393–95, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (declining to hold that warrantless searches of homicide scenes are justified *per se* by the gravity of the crime).

19. Tr., 6/26/98, 66.

van with the robbery—they knew that the robber had a gun which had not yet been recovered and had fled from the bank directly to 570 Isham Street—and promptly obtained a search warrant.[20] And while the rules do not appear to contemplate oral applications for arrest warrants, the government failed even to demonstrate that a written application could not have been made between 4 p.m., if not earlier, and the time of the entry.[21]

This failure ultimately is dispositive of this point. Law enforcement personnel on the scene were entirely justified in regarding this as a serious and potentially hazardous situation from the moment they arrived. Nevertheless, the protection afforded by the Fourth Amendment's warrant requirement against official entry into private homes without prior approval by a neutral magistrate was among the significant goals of our forefathers' fight for independence more than 200 years ago. That bulwark of liberty may not be disregarded absent a persuasive showing that the situation precluded application for a warrant.

*The Consent to Search*

Given the conclusion that the entry into the apartment was unconstitutional and the finding that Ms. Mattai consented to the search, the remaining questions are whether her consent was (1) voluntary and, if so, (2) tainted by the unlawful entry.

*Voluntariness*

◼ "The question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."[22] In this circuit, the test is an objective one—whether the agents had a reasonable basis for believing that there was valid consent to the search.[23] In applying this test, it is appropriate to consider the "particularities of the situation that is presented in any given case" and the "possibly vulnerable subjective state of the person who consents."[24] Other relevant factors are whether the defendant was in custody and in handcuffs,[25] whether there was a show of force,[26] whether the agents told the defendant that a search warrant would be obtained,[27] whether the defendant had knowledge of the right to refuse consent,[28] and whether the defendant previously had refused to consent.[29]

◼ A number of the relevant factors support the defendant. The police certainly made a show of force in surrounding and ultimately forcing entry into the apartment. In entering, they ignored Ms. Mattai's wishes and her assertion that they had no lawful right to do so. She initially was arrested and handcuffed. She was agitated immediately after the officers entered. Nevertheless, she was taken back into the apartment. The handcuffs were removed and she was seated at her kitchen table. Special Agent Hatton explained why the officers had broken in and arrested Lavan. Ms. Mattai calmed down. Agent Hatton went over the consent form. Importantly, Ms. Mattai was entirely aware

20. FED. R. CRIM. P. 41(c)(2).

21. *See generally* 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 6.5(b), at 347–48 (1996).

22. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

23. *United States v. Garcia,* 56 F.3d 418, 423 (2d Cir.1995) (quoting *Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)); *see also Ohio v. Robinette,* 519 U.S. 33, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996) ("Reasonableness is measured in objective terms by examining the totality of the circumstances.").

24. *Schneckloth,* 412 U.S. at 227, 229, 93 S.Ct. 2041.

25. *E.g., United States v. Kim,* 25 F.3d 1426, 1432 (9th Cir.), *cert. denied,* 513 U.S. 1030, 115 S.Ct. 607, 130 L.Ed.2d 517 (1994); *United States v. Kozinski,* 16 F.3d 795, 810 (7th Cir.1994).

26. *E.g., United States v. Chaidez,* 906 F.2d 377, 381 (8th Cir.1990).

27. *E.g., United States v. Severe,* 29 F.3d 444, 446 (8th Cir.1994), *cert. denied,* 513 U.S. 1096, 115 S.Ct. 763, 130 L.Ed.2d 660 (1995); *United States v. Spires,* 3 F.3d 1234, 1237 (9th Cir.1993); *United States v. Faruolo,* 506 F.2d 490, 497 (2d Cir. 1974) (Newman, J., concurring).

28. *Schneckloth,* 412 U.S. at 227, 93 S.Ct. 2041.

29. *E.g., United States v. Pulvano,* 629 F.2d 1151, 1154 (5th Cir.1980).

of her rights. She had asserted them forcefully for six hours in refusing the officers entry into her apartment, even pointing out to one of the officers her view that they needed a warrant to enter and responding to a suggestion that a warrantless entry might be appropriate by telling the officer that there was no emergency. Having viewed her demeanor on the witness stand and considered the contents of the recorded telephone conversations between Ms. Mattai and the Hostage Negotiating Unit officers, the Court is firmly convinced that her will was not overborne. Her consent was voluntary, and the officers reasonably so perceived it.

### Taint

■ As a general proposition, "evidence derivative of a constitutional violation must be suppressed as the 'fruit of a poisonous tree' unless the taint of the constitutional violation has been dissipated." [30] Hence, where police violate Fourth Amendment rights, any subsequent consent to search is valid only if the government establishes that events following that initial illegal conduct sufficiently eliminated the taint. [31]

■ In determining whether the causal connection between the illegal entry and the consent to search was broken, courts consider whether a *Miranda* warning was given prior to the consent, the temporal proximity of the constitutional violation and the consent, the presence of intervening circumstances, "and, particularly, the purpose and flagrancy of the official misconduct." [32] The purpose of the inquiry, however, ultimately is to determine whether the consent was the product of the unconstitutional action, bearing in mind that the purpose of the exclusionary rule "is to deter—to compel respect for the constitutional guaranty in the only effective available way—by removing the incentive to disregard it." [33]

■ In this case, several factors support defendant's argument that the consent was tainted. Ms. Mattai's consent followed very quickly on the heels of the unlawful entry. There is no evidence that she was given *Miranda* warnings, although the significance of this fact is somewhat limited because it is unclear whether she was in custody at the time she gave consent. The only intervening circumstance was Agent Hatton's explanation of what had transpired and his request for consent. Hence, the government's principal argument is that the constitutional violation was neither flagrant nor born of ulterior motives.

The government's contention is not lightly to be disregarded. The police clearly had enough to obtain a warrant. Although the safety concerns were insufficient to justify the warrantless entry given the availability of a warrant, they nevertheless were real and in fact motivated the officers' actions. The police, moreover, acted only after clearing the warrantless arrest with the United States Attorney's office. Thus, the failure to obtain a warrant was the product of a mistaken judgment concerning the existence of exigent circumstances. Nevertheless, the lack of any nefarious motive is not alone sufficient on these facts to overcome the taint.

As indicated above, the right of citizens to be free of warrantless searches of their homes ranks high in the pantheon of our constitutional values. It is vitally important that our law enforcement officials respect that right. Where, as here, the police so clearly could have obtained a warrant and the consent relied upon followed so swiftly and directly on the heels of the forcible and unlawful entry, the government has not carried its burden of showing that the consent was not the product of the constitutional violation. Moreover, the government has advanced no reason to believe that the goal of ensuring compliance with the warrant re-

**30.** *United States v. Restrepo*, 890 F.Supp. 180, 196 (E.D.N.Y.1995); *accord, Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

**31.** *Brown v. Illinois*, 422 U.S. 590, 602, 604, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *United States v. Oguns*, 921 F.2d 442, 447 (2d Cir.1990); *Unit-*

*ed States v. Ceballos*, 812 F.2d 42, 49–50 (2d Cir.1987).

**32.** *Brown*, 422 U.S. at 603–04, 95 S.Ct. 2254; *accord, e.g., Oguns*, 921 F.2d at 447; *Ceballos*, 812 F.2d at 50.

**33.** *Brown*, 422 U.S. at 599–600, 95 S.Ct. 2254.

quirement could be served adequately absent a conclusion that the taint was not dissipated on the facts of this case.

*United States v. Oguns*,[34] despite some similarities to this case, does not require a contrary result. Officers there lawfully arrested the defendant outside his apartment, the door to which was open. They conducted a two minute protective sweep, following which they brought the defendant into the apartment, loosened his handcuffs, read him a consent-to-search form, obtained his consent, and then searched the apartment. The Court of Appeals held that while the arrest and protective sweep were lawful, the officers' reentry with the defendant was not. It nevertheless held that the consent was not tainted by the illegal reentry, despite their close temporal proximity and the lack of any intervening event save the reading of the consent form to the defendant. In doing so, it relied on the officers' good faith and, quite significantly, the lawfulness of the arrest and initial entry, writing "The appropriateness of the first entry, under these circumstances, and of the lawful arrest had the effect of mitigating the egregiousness of the second illegal entry."[35]

Here the police entered the apartment illegally in the first place. Hence, while they acted in good faith, the counterweight that allowed the Circuit to uphold the search in *Oguns* is entirely absent here. Moreover, this distinction serves the underlying policy of the Fourth Amendment. As the arrest and initial entry in *Oguns* were lawful, the police were properly in contact with the defendant and able to discuss consent. The fact that they reentered the apartment to have that conversation was not a substantial factor contributing to the defendant's decision to grant permission to search. Here, on the other hand, the unlawful entry afforded the opportunity for Agent Hatton to obtain Ms. Mattai's consent. Accordingly, the taint of the illegal entry was not dissipated in this case.

### Inevitable Discovery

The government argues also that the motion to suppress should be denied on the ground that it had begun the warrant application process at the time the entry was made, that the warrant would have issued, and that the evidence in question here inevitably would have been discovered. In evaluating the government's contention, it is useful to trace briefly the development of the inevitable discovery doctrine.

The roots of the doctrine lie in *Silverthorne Lumber Co. v. United States*.[36] The facts were straightforward. Federal agents entered the defendant's office "without a shadow of authority ... and made a clean sweep of all the books, papers and documents found there."[37] The district court ordered the return of the evidence, but the government served subpoenas to produce the originals. The defendant refused to comply and was held in contempt. In reversing the contempt conviction on the ground that the government could make no use of the illegally seized evidence because it was fruit of a poisonous tree, the Court, in frequently quoted language, observed:

> "Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed."[38]

Thus, where the government obtains evidence both from lawful and unlawful sources, the evidence is admissible because "it can be said that the fruit not only grows from the poisonous tree, but also grows from another, non-poisonous tree."[39]

---

34. 921 F.2d 442.

35. *Id.* at 448.

36. 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

37. *Id.* at 390, 40 S.Ct. 182.

38. *Id.* at 392, 40 S.Ct. 182.

39. Robert M. Bloom, *Inevitable Discovery: An Exception Beyond the Fruits*, 20 AM. J. CRIM. L. 79, 80 (1992).

In *Nix v. Williams*,[40] the independent source rule led directly to the inevitable discovery doctrine. In *Nix*, the police illegally questioned the defendant and, as a result, learned the whereabouts of a murder victim's body. Although the location of the body would have been suppressible as the product of a violation of the Sixth Amendment, the Supreme Court nevertheless held it admissible because a search party, independently and methodically scouring a defined expanse, was only a couple of miles from the body at the time of the illegal questioning and inevitably would have discovered it within the next several hours. In rejecting the defendant's contention that his conviction should be reversed because the trial court erred in denying his motion to suppress the body and all related evidence, the Court reasoned that the purpose of the exclusionary rule is to deter law enforcement misconduct by ensuring that the government not be placed in a better position by reason of any illegality.[41] But it went on to say that there is no justification for putting the government in a worse position than it "would have been in absent any error or violation."[42] In consequence, it held, the illegally obtained evidence would not be suppressed because the government had established "that the information ultimately or inevitably would have been discovered by lawful means—here the volunteers' search."[43] It added that " the deterrence rationale has … little basis" in these circumstances.[44]

*Nix* thus far is the only Supreme Court decision dealing with the inevitable discovery doctrine and it understandably left a good many questions unanswered.[45] For present purposes, the most significant is whether and in what circumstances the doctrine applies where, as here, the constitutional violation is of the Fourth Amendment's warrant requirement rather than of the Sixth Amendment, as in *Nix*.

The problem is simply put. In *Nix*, the improper questioning of the defendant was entirely independent of the active search for the body that the Court found inevitably would have led to the evidence at issue. While excluding the evidence would have deterred the police to some extent from engaging in improper questioning, the fact that the evidence inevitably would have been obtained by independent investigative means already under way meant that exclusion would have had the unacceptable result of placing the government in a worse position than it would have occupied had the questioning not taken place. The social costs of exclusion in such circumstances, the Supreme Court held, thus would vastly have exceeded the modest benefits of added deterrence.[46]

The calculus, some have argued, is different in the Fourth Amendment warrant requirement context. The Fourth Amendment requires that probable cause determinations be made by a neutral and detached judicial officer, not by law enforcement officials. Hence, some courts have held that a warrantless search cannot later be justified on an inevitable discovery theory because such a rule "would tend in actual practice to emasculate the search warrant requirement of the Fourth Amendment."[47] Law enforcement

---

**40.** 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

**41.** *Id.* at 442–43, 104 S.Ct. 2501.

**42.** *Id.* at 443, 104 S.Ct. 2501.

**43.** *Id.* at 444, 450, 104 S.Ct. 2501.

**44.** *Id.* at 444, 104 S.Ct. 2501.

**45.** R. Bradley Lamberth, *The Inevitable Discovery Doctrine: Procedural Safeguards to Ensure Inevitability*, 40 BAY, L. REV. 129, 136 (1988); *see generally* WAYNE R. LAFAVE, SEARCH AND SEIZURE § 11.4(a), at 240–53 (1996); Robert M. Bloom, *Inevitable Discovery: An Exception Beyond the Fruits*, 20 AM. J. CRIM. L. 79 (1992); Steven P. Grossman, *The Doctrine of Inevitable Discovery: A Plea for Reasonable Limitations*, 92 DICK. L. REV. 313 (1988); Note, *The Inevitable Discovery Exception, Primary Evidence, and the Emasculation of the Fourth Amendment*, 55 FORD. L. REV. 1221 (1987).

**46.** *Nix*, 467 U.S. at 445, 104 S.Ct. 2501.

**47.** *United States v. Griffin*, 502 F.2d 959, 961 (6th Cir.), *cert. denied*, 419 U.S. 1050, 95 S.Ct. 626, 42 L.Ed.2d 645 (1974); *accord*, *United States v. Mejia*, 69 F.3d 309, 319–20 (9th Cir.1995); *United States v. Buchanan*, 904 F.2d 349, 357 (6th Cir. 1990); *United States v. Echegoyen*, 799 F.2d 1271, 1280 (9th Cir.1986); *United States v. Satterfield*, 743 F.2d 827, 846–47 (11th Cir.1984), *cert. denied*, 471 U.S. 1117, 105 S.Ct. 2362, 86 L.Ed.2d 262 (1985).

officials would have an incentive to dispense with an application to a neutral magistrate whenever they believe that they can demonstrate probable cause after the fact. In consequence, exclusion in these circumstances arguably would serve the deterrent function to an extent greater than would have been the case in *Nix*. But any contention that *Nix* should not apply where the illegality is a warrantless search is foreclosed in this Circuit.

■ In *United States v. Whitehorn*, the Court of Appeals held, albeit without discussion of the possibility that exclusion is more appropriate in warrantless search cases than it was in *Nix* because it could deter officials from ignoring the warrant requirement,[48] that the inevitable discovery doctrine prevented suppression of evidence obtained in an illegal warrantless search.[49] And it has reaffirmed that view recently in *United States v. Cabassa*,[50] although that was a case in which it found that the requirements of the doctrine were not satisfied.

■ Lavan argues that *Whitehorn* is distinguishable on the ground that the police in that case ultimately obtained a warrant, albeit only after the illegal search had been conducted. He contends that the Court should "establish a bright line rule that inevitable discovery does not apply in cases where police engage in warrantless entries into private homes where no exigent circumstances exist at the time of entry and where they never subsequently obtain a search warrant." [51] The difficulty with the argument is that the Second Circuit in *Cabassa* noted that "the government never actually obtained a warrant" in that case, but went on to hold that the inevitable discovery doctrine did not

apply in substance on the ground that a series of uncertainties as to whether the government would have obtained the disputed evidence in a lawful manner rendered the discovery considerably less than inevitable.[52] Had the failure belatedly to obtain the warrant been controlling, the Court would not have been obliged to assess the probability of lawful discovery. It therefore is clear in this Circuit that evidence seized in an illegal warrantless search nevertheless may be used by the government if the requirements of the inevitable discovery doctrine are satisfied even where the government does not obtain a warrant after the search. The issue in these cases therefore is how sure a court must be that a warrant would have issued and that the evidence would have been found before a motion to suppress will be denied on the basis of the inevitable discovery doctrine.

*Cabassa* is exceptionally helpful in making that determination. The Circuit there made clear that relevant factors include (1) "the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search," [53] (2) the strength of the showing of probable cause at the time the entry occurred,[54] (3) whether a warrant ultimately was obtained, albeit after the illegal entry,[55] and (4) "evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli." [56] The status of the application process, it said, is an important factor because it relates both to "whether a warrant would in fact have issued" and "whether the same evidence would have been discovered pursuant to the warrant" before being destroyed or removed from the location.[57] It reasoned that discovery was not

---

**48.** *See United States v. Leon*, 468 U.S. 897, 919, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (quoting *United States v. Peltier*, 422 U.S. 531, 539, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975)).

**49.** 829 F.2d 1225, 1230–31 (2d Cir.1987), *cert. denied*, 487 U.S. 1237, 108 S.Ct. 2907, 101 L.Ed.2d 939 (1988).

**50.** 62 F.3d 470 (2d Cir.1995).

**51.** Letter, Cary A. Bricker, Esq. to Court, July 2, 1998, at 1.

**52.** *Cabassa*, 62 F.3d at 473–74.

**53.** *Id.* at 473.

**54.** *Id.*

**55.** *Id.*

**56.** *Id.* n. 2.

**57.** *Id.* at 473.

inevitable on the facts before it in view of the debatable strength of the showing of probable cause, the failure ultimately to obtain a warrant, the preliminary state of the warrant application, and the inability to forecast whether the warrant would have been obtained, if at all, while the evidence still was present.[58] It concluded by observing that "[a]t best, the government's showing in the instant matter would support separate findings that more probably than not a warrant would eventually have issued and that more probably than not the evidence would have been [in the same place] when a lawful search occurred. Either of these findings is susceptible to factual error ... and the combined chance of error undermines the conclusion that discovery of the evidence pursuant to a lawful search was inevitable."[59] It went on to point out, in a reference to probability theory, that there are "semantic problems" in using the preponderance of the evidence standard to prove inevitability because proof of several independent factors, each by a preponderance of the evidence but each necessary to the conclusion that the evidence actually would have been discovered lawfully, could result in receiving illegally seized evidence where there is less than a 50 percent chance of the evidence being discovered independently.[60]

■ The teaching of *Cabassa*, which is supported by principles of probability, thus is straightforward. It suggests that a trial court's task in this context is to deny the motion to suppress on the ground of inevitable discovery only if it has a high level of confidence that the warrant in fact would have issued and that the specific evidence in question would have been obtained by lawful means. Inevitable discovery analysis therefore requires a court to examine each of the contingencies that would have had to have been resolved favorably to the government in order for the evidence to have been discovered legally and to assess the probability of that having occurred. In warrantless search questions, it requires consideration of whether a warrant would have been ·sought,[61] whether a warrant would have issued, whether the warrant would have specified the articles seized, whether the articles would have remained in place by the time the warrant would have been executed,[62] and whether the articles would have been found in the hypothetical warranted search, perhaps among other variables. The more contingencies there are, and the lower the probability that each would have been resolved in the government's favor, the lower the probability that the evidence would have been found by lawful means.

■ While the requisite level of certainty of discovery that the government must prove remains unclear,[63] that issue comfortably may be left for another day. In this case,

---

**58.** *Id.* at 473–74.

**59.** *Id.* at 474.

**60.** *Id.*
Under established principles of probability theory, the probability that both of two independent events will occur is the product of the probability of each. Put differently, if P(A) is the probability of the occurrence of event A and P(B) is the probability of the occurrence of event B, and if the occurrence of A is independent of the occurrence of event B, then the probability of the occurrence of both event A and event B is the product of the probabilities of the occurrence of each, or P(A & B) = P(A)P(B). TARO YAMANE, STATISTICS: AN INTRODUCTORY ANALYSIS § 5.7, at 107–10 (2d ed.1967). Thus, if it is barely more probable than not (e.g., 51 percent likely) that a warrant will issue and barely more probable than not that not that the evidence will still exist and be found after issuance of the warrant, the probability of finding the evidence pursuant to a warrant is 26.01 percent.

**61.** *See United States v. Eggers*, —— F.Supp. ——, ——, No. S1 97 CR 1004(LAK), 1998 WL 262349, at *10 (S.D.N.Y. May 19, 1998) (referring to uncertainty as to whether agents would have sought a warrant at all).

**62.** *See id.* (referring to uncertainty as to whether evidence would have remained in an unguarded house to which others may have had access for the day or more that would have been required to obtain and execute a warrant).

**63.** *Compare, e.g., United States v. Cherry*, 759 F.2d 1196, 1204 (5th Cir.1985), *cert. denied*, 479 U.S. 1056, 107 S.Ct. 932, 93 L.Ed.2d 983 (1987) (preponderance), *with Government of Virgin Islands v. Gereau*, 502 F.2d 914, 927(3d Cir.1974), *cert. denied*, 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975) (clear and convincing); *Cabassa*, 62 F.3d at 474 (questioning means of proper·application of preponderance standard in these circumstances).

there were relatively few contingencies, and the probability that each would have been resolved in the government's favor was extraordinarily high. The facts that the warrant application was in preparation and that the Magistrate Judge had been contacted demonstrate that there was a high probability that the warrant in fact would have been sought. The great strength of the government's evidence of probable cause—which strongly distinguishes the case from *Cabassa*—demonstrates that there was no material risk that the warrant would not have issued. The close correspondence between the evidence seized—the gun and articles of clothing possibly worn by the bank robber—and what surely would have been specified in the warrant shows that there was little risk that a warrant would not have permitted seizure of the evidence that the police in fact obtained via the warrantless entry and search. There was no risk of disappearance of the evidence pending execution of a warrant, as the apartment was surrounded and the physical nature of the evidence made its destruction or disposal in these circumstances virtually impossible. Hence, this Court is persuaded, on any foreseeable standard of proof,[64] that the evidence here at issue would have been obtained by lawful means in that a warrant authorizing entry and the search for these articles would have issued and the evidence been found in short order had the police not entered the apartment. While the better practice surely would have been to obtain the warrant before entering and, in any case, to have pursued the application process even after consent was obtained, the showing of inevitability here is so strong as to overcome any deficiencies.

### Conclusion

For the foregoing reasons, the defendant's motion to suppress the evidence seized from the apartment at 570 Isham Street is denied.

SO ORDERED.

**64.** There is some debate as to whether the requisite standard is a preponderance of, or clear and convincing, evidence. The Court is persuaded on either.