UNITED STATES of America,

v.

**Chaka MURPHY and George Lewis, Defendants.**

**No. 98 CRIM. 307(LAK).**

United States District Court, S.D. New York.

Aug. 13, 1998.

Kevin S. Reed, Asst. U.S. Atty., Mary Jo White, U.S. Atty., for U.S.

Yuanchung Lee, Leonard F. Joy, The Legal Aid Society, Federal Defender Div., for Defendant Chaka Murphy.

Lawrence F. Ruggiero, New York City, for Defendant George Lewis.

## MEMORANDUM OPINION

KAPLAN, District Judge.

This matter is before the Court on defendants' motions to suppress physical evidence seized in a search of Lewis' apartment at 1011 East 227th Street in the Bronx following the arrest of Murphy at that address on November 4, 1997 as well as statements made by the defendants during custodial questioning later that day as well as for other relief. This is the Court's decision following an evidentiary hearing held on August 3–4, 1998.

*Facts*

The broad outlines of the events of November 4 are undisputed. In late October, law enforcement officers learned from a confidential informant that Murphy had offered to sell a .357 magnum and a TEC machine gun with a banana clip, that Murphy had an unidentified cousin who was an unidentified member of the New York Police Department ("NYPD"), and that the cousin was a source of the guns. On November 4, at least eight officers arrived at the subject address early in the morning armed with a warrant for Murphy's arrest, but with no search warrant. After placing a ruse telephone call by which they determined that Murphy was in Lewis' second floor apartment, the officers rang the bell. Murphy answered the door and was told that he was under arrest. The officers then accompanied Murphy up the stairs to Lewis' apartment, placed him in a bathroom, entered Lewis' bedroom and other parts of the apartment, found a photo album and a sawed off shotgun, then obtained execution of consent to search forms by both Lewis and Murphy, searched the apartment, and found a .38 caliber revolver and ammunition. At some point, the officers found a bullet proof vest as well. Both men then were arrested and taken to a BATF office where each signed a *Miranda* waiver, submitted to questioning, and made statements now sought to be suppressed.

Not surprisingly, many details concerning the events of that date are hotly disputed in quite material respects. The government maintains that Murphy arrived at the door in a state of partial undress and asked to be permitted to go upstairs to dress, thus justifying the officers' presence in the apartment and a protective sweep. It concedes that the opening of the photo album was unlawful as to Murphy, but argues that the shotgun was in plain view and that both defendants gave valid consents to search the apartment. The *Miranda* waivers, it asserts, were both voluntary and untainted. The defendants, for their part, contend that Murphy was fully clothed when he was arrested at the door, that he neither asked to return to the apartment nor invited the officers in, that the officers in effect forced their way in and searched the apartment without consent, that the shotgun was not in plain view, and that the consents to search the apartment were coerced and, in any event, given after the search had been completed. They argue also that the *Miranda* waivers were tainted by the illegal entry into and search of the apartment and were coerced.

The evidence offered by each side is shot through with troublesome inconsistencies and omissions. There is at least one substantial inconsistency between Murphy's hearing testimony and his affirmation [1] as well as a material omission from the affirmation that suggests tailoring of his hearing testimony to the accounts given at the hearing by the government witnesses,[2] who testified before defendants. In addition, a lynchpin of Murphy's contention that he arrived at the door fully clothed and thus could not have asked to return to the apartment to dress was his contention that he spent the time between the ruse call and the officers' arrival making telephone calls to his mother and girlfriend during which he put on his clothes. His mother testified at the hearing and corroborated Murphy on this point. The girlfriend was not called as a witness, which suggests that she would not have done.

---

1. Paragraph 11 of Murphy's affirmation said that he signed the consent to search form after being told that he might as well do so because police already had found the evidence. At the hearing, however, after having heard Detective Kercado testify that Murphy signed only after being told that the officers otherwise would obtain his mother's consent to the search. Murphy testified that he was told that he had to sign because the officers otherwise would obtain consent from his mother or from Lewis. (Tr. 216)

2. Murphy's affirmation (¶¶ 4–5) omitted any reference to the ruse telephone call that preceded the ringing of the doorbell, thus suggesting that Murphy was surprised when officers rang the bell. At the hearing, however, he testified that he was awakened by and dressed as a result of the call before the officers came to the door. (Tr. 204–09) This was quite an important addition to Murphy's account because, if believed, it would undermine the officers' contention that Murphy was not fully dressed when he came to the door and asked to return to the apartment, thus permitting the protective sweep that led immediately to the discovery of the shotgun.

The law enforcement testimony also was inconsistent or improbable in certain respects. For example, Detective Kercado gave two materially different accounts of the finding of the shotgun in the complaint and the amended complaint, both of which he verified. Detective Kercado and Agent Fredericks gave inconsistent accounts of what occurred when Murphy answered the door, the former claiming that Murphy simply went back upstairs under his own power and free of handcuffs and the latter being confident that Murphy was handcuffed at the door. Moreover, it seems unlikely that the officers would have allowed Murphy, who was suspected of selling weapons from the apartment, simply to return to the apartment unrestrained with the officers following behind, as the officers naturally would have perceived themselves to be in significant danger by doing so. Kercado and Fredericks disagreed also as to whether Murphy initially refused to consent to a search and as to whether the officers threatened to approach Murphy's mother for consent. Indeed, officers who testified at the hearing and before the grand jury were unable to agree whether there was a door on the closet where the shotgun was found in Lewis' room and whether it was open or closed immediately prior to the recovery of the shotgun.

Having considered all of the evidence, including the demeanor of the witnesses, and bearing in mind also that the government bears the burden of proof on this motion, the Court finds as follows:

Murphy answered the door a minute or two after the ruse telephone call in a state of partial undress. (Tr. 10–11, 24–25, 28, 43, 58, 132, 152–53, 181) He was handcuffed, taken upstairs in order to permit him to dress, and placed in the bathroom while the officers conducted a protective sweep. (Id. 44–46, 132–33, 154) Two of the officers entered the room in which Lewis was sleeping and woke him while others entered the bedroom occupied the preceding night by Murphy where they seized the photo album. One of the officers in the room with Lewis noticed the stock of the sawed off shotgun protruding into the open door of the closet, investigated, and found the shotgun. (Id. 18–19, 35–37, 114–15, 117, 170–71, 175–76, 178) They arrested Lewis, handcuffed him, took him into the kitchen, showed and explained to him a consent to search form, and obtained his written consent without any controversy or reluctance. (Id. 19–20, 37–38, 55–57, 140–41, 176–77) At or about the same time, other officers took Murphy from the bathroom to his bedroom, explained the consent form to him, and sought his consent as well. (Id. 53–54, 58–59) Murphy initially refused. (Id. 59, 91) The officers then said that they would seek a search warrant, but Murphy refused again. (Id. 59, 91, see 142) When the officers threatened to seek consent from Murphy's mother, who owned the building and resided in the apartment below, however, Murphy relented and signed the consent form. (Id. 59–61, 91–92) The officers then searched the apartment and found the .38 revolver, the ammunition and the bullet proof vest. (Id. 61, 125–26)

Murphy and Lewis then were taken to the BATF office. Their Miranda rights were explained to them. They each signed a waiver form and subsequently made the statements that are challenged here.

### Discussion

#### The Shotgun

 The finding that Murphy answered the door in a state of undress and sought to return to the apartment for his clothes fully justified the officers in accompanying him into the premises and in conducting a protective sweep.[3] Once in the apartment, they were entitled to make a protective sweep to ensure that neither Lewis nor anyone else jeopardized their safety.[4] The shotgun was in plain view and therefore was seized in a lawful manner.[5]

---

3. See, e.g., Washington v. Chrisman, 455 U.S. 1, 7, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982); United States v. Stefano, 555 F.2d 1094, 1101 (2d Cir. 1977).

4. E.g., Maryland v. Buie, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990); United States v. Hernandez, 941 F.2d 133, 137 (2d Cir.1991).

5. Horton v. California, 496 U.S. 128, 136, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).

*The .38 Revolver, the Ammunition, and the Bulletproof Vest*

In view of the lawful entry and the fact that the .38, the ammunition, and the vest were seized only after the execution of the consents to search, the only issues as to those searches and seizures are whether they were (1) involuntary or, if voluntary, (2) tainted by the opening of the photo album.

*Voluntariness*

■■■ "The question whether a consent to search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."[6] "In this circuit, the test is an objective one—whether the agents had a reasonable basis for believing that there was valid consent to the search."[7] Relevant factors include the particularities of the situation at issue, the possibly vulnerable state of the person granting consent, whether the person consenting was in custody and in handcuffs, whether there was a show of force, whether the officers told the consenter that a search warrant would be obtained, whether the consenter had knowledge of the right to refuse consent, and whether the consenter previously had refused to consent.[8]

■■ Lewis' consent unquestionably was valid. Although he was in custody and had been handcuffed prior to signing the consent form, there was no show of force except to the extent that the presence of as many as eight officers in the apartment might be so regarded. None of the officers drew a weapon at any time. Lewis is an articulate and intelligent man. He was calm throughout. He had no unusual vulnerability. The consent form, which he read and which was explained to him before he signed it, gave clear notice of his rights. At no point did he refuse consent. While the officers told him that they were likely to get a search warrant if consent were refused and referred to the seizure of the shotgun, the officers in all the circumstances had more than ample basis for believing that the consent was valid.

■■ Murphy's consent was more problematic. The relevant facts are identical to those applicable to Lewis save in two particulars. First, Murphy initially refused consent. Detective Kercado responded that Murphy would sit there while the officers obtained and executed a search warrant. Murphy again refused. He relented only when the officers threatened to seek the consent of his mother. Second, in obtaining Murphy's consent, Agent Fredericks referred to the strength of the evidence against him. Thus, there was greater reason for the officers to believe that Murphy's consent was given reluctantly. Nevertheless, it is unnecessary to make a finding as to the voluntariness of Murphy's consent in view of the finding that Lewis' was valid.

The apartment in question was rented to Lewis. According to Murphy, he resided in his mother's first floor apartment. (Tr. 201; *see also id.* 268) He occasionally stayed in Lewis' second floor apartment, as Lewis was a long-standing friend, and he did so on the night of November 3–4, 1997. (*Id.* 201–02) In consequence, Lewis unquestionably had the right to consent to a search of the entire apartment, and that consent was valid as to Murphy. Indeed, that would been true even if Lewis and Murphy shared the apartment.[9] Accordingly, Lewis' voluntary consent gave the officers the right to search the apartment.

*Taint*

Defendants argue also that the consents to search were tainted by the allegedly illegal entry into the apartment and seizure of the shotgun and by the concededly illegal search of Murphy's photo album.

"As a general proposition, 'evidence derivative of a constitutional violation must

---

6. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

7. *United States v. Lavan,* 10 F.Supp.2d 377, 384 (S.D.N.Y.1998) (citing *United States v. Garcia,* 56 F.3d 418, 423 (2d Cir.1995)).

8. *Lavan, supra,* 10 F.Supp.2d at 384 (citing cases).

9. *Illinois v. Rodriguez,* 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990); *United States v. Matlock,* 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

be suppressed as the fruit of a poisonous tree' unless the taint of the constitutional violation has been dissipated. "Hence, where police violate Fourth Amendment rights, any subsequent consent to search is valid only if the government establishes that events following that initial illegal conduct sufficiently eliminated the taint."

"In determining whether the causal connection between the illegal [activity] and the consent to search was broken, courts consider whether a Miranda warning was given prior to the consent, the temporal proximity of the constitutional violation and the consent, the presence of intervening circumstances 'and, particularly, the purpose and flagrancy of the official misconduct.' The purpose of the inquiry, however, ultimately is to determine whether the consent was the product of the unconstitutional action, bearing in mind that the purpose of the exclusionary rule 'is to deter—to compel respect for the constitutional guaranty in the only effective available way—by removing the incentive to disregard it.' " [10]

■ As the Court has found that the entry and the seizure of the shotgun were lawful, only the photo album remains. But the photo album played no role in Lewis' consent to search the apartment. Hence, his consent to search was untainted.

*The Subsequent Custodial Statements*

Each of the defendants later was questioned at the BATF office after first executing a waiver of *Miranda* rights. Each seeks to suppress his subsequent statements on the ground that his waiver was involuntary. In addition, Murphy claims that his consent, even if voluntary, was tainted.

■ The voluntariness of the defendants' custodial statements depends upon "the totality of all the surrounding circumstances, including the accused's characteris-

tics, the conditions of interrogation, and the conduct of law enforcement officials." [11] Even voluntary statements, however, may be excluded if they are tainted by exploitation of a prior illegality. [12] The standard governing the taint analysis is that already described above. [13]

*Voluntariness*

Upon his arrival at the BATF office, Murphy was placed in an interview room with Detective Kercado and three or four other officers. He was told that this would be his last chance to cooperate, that he could help himself by doing so, and that he was facing stiff penalties, at least six years and perhaps 10 years, for each gun depicted in the photographs in the album. (Tr. 64, 85–86, 100–01) He was given the waiver of rights form, read it, and signed. (*Id.* 62–63)

Lewis too was placed in an interview room and questioned by the officers following Murphy. He first was given the waiver form, which he read and signed with no apparent reluctance. (*Id.* 65–66) He consented to the recording of his statement.

■ Both of these defendants are articulate, intelligent men. Both were involved in legitimate business at the time of the interrogation. Murphy had prior experience with the criminal justice system. Both were advised of their rights and signed waiver forms, which itself is significant evidence of the voluntariness of their waivers. There was nothing about the circumstances of the interrogations that undermined the voluntariness of their waivers. Nor was there any violence or overbearing by the officers save to the extent that the threat connected to the photo album and directed to Murphy might be so construed. In consequence, the Court finds that each of the waivers was knowingly and voluntarily given.

**10.** *Lavan, supra,* 10 F.Supp.2d at 385 (quoting *Brown v. Illinois,* 422 U.S. 590, 599–600, 603–04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)) (footnotes omitted).

**11.** *United States v. Anderson,* 929 F.2d 96, 99 (2d Cir.1991).

**12.** *United States v. Thompson,* 35 F.3d 100, 105–06 (2d Cir.1994).

**13.** *Id.* 35 F.3d at 105.

*Taint*

 The taint analysis as to Murphy is less favorable to the government. The officers concededly and deliberately exploited the photographs found as a result of the illegal perusal of the photo album in seeking to persuade Murphy to waive his rights. (Tr. 100) Further, while there was no real connection between the limited use of the photos and the consent to search the apartment, the waiver of *Miranda* rights followed immediately on the heels of the exploitation of the photographs by the threat that the defendant could be sentenced to a substantial prison term with respect to each weapon shown in the photos unless, of course, the defendant cooperated. The government's contention that Murphy must have been more concerned about the .38 revolver seized at the apartment and about the taped conversations in which Murphy acknowledged having sold another firearm is unpersuasive. The .38 was found in a hall closet in Lewis' apartment. And while there is something to the argument about the taped conversations, the Court is convinced that the threat based on the photos played a sufficiently substantial role in Murphy's decision to taint his consent. Finally, the officers certainly should have known that the use made of the photographs was improper. Accordingly, the post-waiver custodial statements made by Murphy must be suppressed.

*Conclusion*

The motions to suppress are denied in all respects except that Murphy's motion is granted as to his (1) custodial statements and (2) the photo album. As indicated in open court on August 3, 1998, the defendants' motions to sever are granted. Lewis' application for leave to engage a firearms expert is granted. The motions for advance notice of any Rule 404(b) evidence are granted to the extent that such disclosure shall be made at least two weeks before trial. The motions for an order requiring the preservation of officers' notes are denied as moot. Murphy's motion to dismiss Count I of the indictment as duplicitous is denied without prejudice based on the government's representation that it will supercede the indictment promptly.

The foregoing constitute the Court's findings of fact and conclusions of law. To the extent the testimony of the defendants' is not adopted in the foregoing findings, it is not credited.

SO ORDERED.