UNITED STATES of America, Appellee,

v.

Jose M. CABASSA, Defendant–Appellant.

No. 517, Docket 94–1251.

United States Court of Appeals,
Second Circuit.

Argued Dec. 8, 1994.

Decided Aug. 11, 1995.

---

WINTER, Circuit Judge:

José Manuel Cabassa appeals from Judge Patterson's denial of his motion to suppress evidence seized in the course of a warrantless search of his apartment. The government argues that the evidence in question would inevitably have been lawfully discovered pursuant to a search warrant to be issued that day. We disagree and reverse.

## BACKGROUND

In May 1991, a confidential informant ("CI") gave a "tip" to DEA special agent James McCormick, a member of the Westchester County Drug Task Force. The CI told McCormick that he had known a person named "Manny" for approximately five to six months and that he had heard from "others on the street" that Manny was "involved in a day-to-day narcotics distribution and operation." The CI gave a description of Manny, and informed McCormick that Manny had been in jail for a violent crime, that he kept weapons, and that he was a "shooter." Manny allegedly ran his drug business from an apartment at 158 East 119th Street in Manhattan but maintained another apartment on East 120th Street where he stored and processed the narcotics.

A few weeks later, the CI informed McCormick that he had met Manny to discuss a purchase of cocaine. The CI stated that he visited Manny's apartment at 158 East 119th Street. The CI gave McCormick a telephone number where Manny could be reached. When McCormick checked the telephone number, he found that it was registered to a female residing at 158 East 119th Street, apartment 4F.

On June 18, 1991, the CI told McCormick that Manny had a kilogram of cocaine at his apartment that he wanted to sell "right away" because he was anxious to take a three or four week vacation. Based on this information, McCormick decided to obtain a search warrant for Manny's 119th Street apartment. On June 19, 1991, McCormick and other members of the Drug Task Force met at DEA headquarters in Manhattan. Upon his arrival, McCormick learned that Special Agents Eileen Dinnan and Mark

Mark B. Gombiner, New York City (The Legal Aid Soc., Federal Defender Div. Appeals Bureau, of counsel), for defendant-appellant.

Peter T. Gelfman, Asst. U.S. Atty. S.D.N.Y., New York City (Mary Jo White, U.S. Atty., Paul G. Gardephe, Asst. U.S. Atty., of counsel), for appellee.

Before: OAKES, CARDAMONE, and WINTER, Circuit Judges.

Neimer had already left for the United States Attorney's office to prepare an application for a search warrant. Dinnan and Neimer arrived at the United States Attorney's Office at approximately 12:30 p.m. At approximately 2:30 p.m., McCormick and a team of DEA agents set up a "presurveillance" team around the apartment building at 158 East 119th Street. The team was to maintain surveillance at the target location until the search warrant was obtained and then conduct the search. Dinnan and Neimer were to call McCormick on his mobile telephone as soon as the warrant was procured.

At approximately 3:00 p.m., before he had received any news about the status of the search warrant, McCormick decided to enter the apartment. McCormick testified that he had been worried that Manny would leave the building, or that Manny would become aware of their presence because the agents were "white people" who might "stick out like a sore thumb."

When McCormick and the other agents entered the building, they encountered Roland White, the building superintendent. White told the agents that Manny was in apartment 4F and agreed to accompany them. White knocked on the door of the apartment and identified himself. Cabassa then opened the door. When Cabassa saw the agents, who were wearing DEA jackets and hats, he attempted to close the door. But the agents forced their way into the apartment and handcuffed Cabassa. The agents then conducted a security sweep of the apartment and discovered, in plain view, a scale, cocaine, drug stamps, glassine envelopes, and ammunition for automatic weapons.

After the security sweep had been completed, McCormick received a call from Agent Neimer, who was still at the United States Attorney's office. Neimer had called to ask how many times the CI had met with Manny because this information was needed to complete the warrant application. McCormick informed Neimer that the apartment had been entered and provided the requested information. McCormick then told Cabassa that a warrant was being obtained for his apartment and that "the best thing that [Ca-

bassa] could do to help himself was to give consent to search … prior to the search warrant getting there." Cabassa consented to a search, informing the agents where weapons could be found and providing access to a safe. The agents found nine weapons, a silencer, drug paraphernalia, drug stamps, drug records, ammunition, approximately $18,000, and a kilogram of cocaine.

When McCormick received Cabassa's "consent" at approximately 3:30 p.m., he informed Neimer and the two Assistant United States Attorneys working on the warrant application that consent to search the apartment had been given. Relying on Cabassa's consent, the AUSA's ceased working on the application. No warrant was ever issued.

Cabassa filed a motion to suppress the evidence obtained from the 119th Street apartment. After conducting an evidentiary hearing, Judge Patterson refused to suppress the physical evidence. The district court found that no exigent circumstances justified the DEA's premature entry of the 119th Street apartment. However, the district court concluded that the evidence found in the 119th Street apartment would inevitably have been discovered by lawful means, namely a search warrant, and therefore was admissible. *United States v. Cabassa*, 782 F.Supp. 226, 230–31 (S.D.N.Y.1992).

Cabassa entered a conditional plea of guilty to one count of possession with intent to distribute cocaine within one thousand feet of a school in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(B), and 860, and one count of possession of a firearm during a drug trafficking crime in violation of 18 U.S.C. § 924(c). The plea agreement provided that Cabassa could appeal the district court's denial of his suppression motion. This appeal followed.

## DISCUSSION

■ The inevitable discovery doctrine allows evidence procured as a result of an illegal search to be introduced if "the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S.

431, 444, 104 S.Ct. 2501, 2501, 2509, 81 L.Ed.2d 377 (1984).[1] We have held that:

For inevitable discovery to be demonstrable, it must be the case that the evidence would have been acquired lawfully through an independent source absent the government misconduct.... The exception requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what *would have happened* had the unlawful search never occurred.

*United States v. Eng,* 997 F.2d 987, 990 (2d Cir.1993) (emphasis in original), *cert. denied,* —— U.S. ——, 114 S.Ct. 693, 126 L.Ed.2d 660 (1994).

■ The government argues that it was in the "final stages" of obtaining a warrant when the illegal search occurred and that a magistrate judge would certainly have issued a warrant based on the information that was to be included in the warrant application. Thus, the government argues, a legal search was about to lead to the discovery of the evidence that is the subject of Cabassa's motion to suppress. We disagree.

The government relies heavily upon *United States v. Whitehorn,* 829 F.2d 1225 (2d Cir.1987), *cert. denied,* 487 U.S. 1237, 108 S.Ct. 2907, 101 L.Ed.2d 939 (1988). *Whitehorn* affirmed the admission of evidence obtained during an illegal search pursuant to the inevitable discovery doctrine under somewhat similar yet distinguishable circumstances. In *Whitehorn,* FBI agents had commenced the process for obtaining a warrant over an hour before the illegal search and had at that time "overwhelming" probable cause to support the warrant application. 829 F.2d at 1231. Moreover, a warrant was

actually issued six hours after the initial entry. *Id.* at 1228. Under these circumstances, we concluded that the warrant would inevitably have led to the discovery of the evidence that had been procured illegally.

We cannot draw the same conclusion in the instant matter. In cases in which a claim of inevitable discovery is based on expected issuance of a warrant, the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search is of great importance.[2] First, the extent of completion relates directly to the question of whether a warrant would in fact have issued; ultimate discovery would obviously be more likely if a warrant is actually obtained. Second, it informs the determination of whether the same evidence would have been discovered pursuant to the warrant. If the process of obtaining a search warrant has barely begun, for example, the inevitability of discovery is lessened by the probability, under all the circumstances of the case, that the evidence in question would no longer have been at the location of the illegal search when the warrant actually issued.

In the instant matter, unlike *Whitehorn,* the government never actually obtained a warrant. Also unlike *Whitehorn,* the government's showing of probable cause was not "overwhelming." *Whitehorn,* 829 F.2d at 1229, 1231. Even if we agree with the district court that the government's draft affidavit demonstrated probable cause under the totality of the circumstances standard set forth in *Illinois v. Gates,* 462 U.S. 213, 230, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983), there is some room for disagreement.[3]

---

1. In *Nix,* a police officer induced a suspect to disclose where the body of a murder victim was concealed during a car ride in which the suspect's lawyer was absent. 467 U.S. at 435–36, 104 S.Ct. at 2504–05. Although the officer's conduct violated the suspect's right to counsel, the Supreme Court held that evidence of the victim's body and its condition was admissible because the body would inevitably have been discovered in the condition in which it was found; an intensive search by 200 volunteers was underway at the time of the induced admission, and the body was in the area to be covered by that search. *Id.* at 435, 448–50, 104 S.Ct. at 2504, 2511–12.

2. Also relevant, of course, would be evidence that law enforcement agents "jumped the gun" because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli. No such evidence exists in the present case. Based on the record, there is no reason to question McCormick's good faith belief in the existence of exigent circumstances.

3. The draft affidavit established that: (i) the informant had been "consistently reliable" in the past, *Gates,* 462 U.S. at 233, 103 S.Ct. at 2329 (citing reliability as a factor), (ii) the CI had been tracking "Manny" for about three months, and

There is thus a residual possibility that a magistrate judge would have required a stronger showing of probable cause.

More significantly, no one can say with any certainty how much time would have been taken to complete the application, to submit it to the magistrate judge for consideration, and to secure the warrant's issuance. Although the warrant process had commenced, the application was not completed at the time of the search. Indeed, Neimer called McCormick to obtain additional information to support the application after McCormick had already entered the apartment and discovered some of the incriminating evidence. Moreover, McCormick decided to conduct the premature search precisely because he feared that the agents would be detected, an event that might well have led to the disappearance of the evidence. McCormick's assertion of "exigent circumstances" thus undercuts the argument that the same evidence would inevitably have been found by a later search pursuant to a warrant.

At best, the government's showing in the instant matter would support separate findings that more probably than not a warrant would eventually have issued and that more probably than not the evidence would have been in the apartment when a lawful search occurred. Either of these findings is susceptible to factual error—the magistrate judge might not be satisfied as to the showing of probable cause or, more likely, the evidence might disappear before issuance or execution of a warrant, or both—and the combined chance of error undermines the conclusion that discovery of the evidence pursuant to a lawful search was inevitable.

There are, of course, semantic problems in using the preponderance of the evidence standard to prove inevitability. To say that more probably than not event "X" would have occurred is to say only that there is a

50% + chance that "X" would have occurred. Clearly, the doctrine of inevitable discovery requires something more where the discovery is based upon the expected issuance of a warrant. Otherwise, it would result in illegally seized evidence being received when there was a 49% chance that a warrant would not have issued or would not have issued in a timely fashion, hardly a showing of inevitability. Given the present facts, we need not probe further into the semantic puzzle other than to note the difference between proving by a preponderance that something would have happened and proving by a preponderance that something would inevitably have happened.

We thus conclude that the district court's finding that the evidence in question inevitably would have been discovered by lawful means was clearly erroneous.

We therefore reverse.

---

(iii) independent investigation of the phone number had corroborated the CI's information about the address of the apartment and had pinpointed the target location for the search, *id.* at 241–42, 103 S.Ct. at 2333–34 (giving great weight to corroboration of an informant's tip by independent police work). However, in *Whitehorn,*

> [t]hrough interviews with neighbors as well as prior extensive investigation, [the F.B.I.

agents] knew that two of the apartment's occupants . . . had a history of trafficking in false *identification documents, weapons, and explosives;* indeed, the night before [the two occupants] had been arrested carrying all but the latter.

829 F.2d at 1231.