12-2843-cr
United States v. Stokes

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2012

(Argued: May 28, 2013     Decided: August 20, 2013)

Docket No. 12-2843-cr

UNITED STATES OF AMERICA,

*Appellee*,

— v. —

VAUGHN STOKES, ALSO KNOWN AS QUA

*Defendant-Appellant*.[*]

B e f o r e:

WINTER, HALL, and LYNCH, *Circuit Judges*.

Defendant Vaughn Stokes appeals from a judgment entered on July 12, 2012, in

the United States District Court for the Southern District of New York (John F. Keenan,

*Judge*), convicting him, after a bench trial on stipulated facts, of one count of possession

---

[*] The Clerk of Court is respectfully directed to amend the caption to conform to that above.

of a firearm as a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) and

one count of possession of a machine gun in violation of 18 U.S.C. §§ 922(o)(1) and

924(a)(2).  The district court sentenced Stokes to 60 months' imprisonment, followed by

three years' supervised release, and a mandatory $200 special assessment.  The

conviction followed the district court's denial of Stokes's suppression motion based on its

conclusion that the firearms at issue would inevitably have been discovered even if law

enforcement officers had not illegally entered Stokes's motel room.  Because we conclude

that the district court erred in denying Stokes's suppression motion, we VACATE

appellant's conviction, REVERSE the denial of the suppression motion, and REMAND

the case for further proceedings.

       VACATED and REMANDED.

---

> BARRY D. LEIWANT, New York, New York, *for* Defendant-Appellant Vaughn
> Stokes.
>
> BENJAMIN ALLEE, Assistant United States Attorney (Jennifer G. Rodgers,
> Assistant United States Attorney, *on the brief*), *for* Preet Bharara,
> United States Attorney for the Southern District of New York, New
> York, New York.

---

GERARD E. LYNCH, *Circuit Judge*:

       Following a bench trial on stipulated facts, Defendant Vaughn Stokes was

convicted of violating 18 U.S.C. § 922(g)(1), which criminalizes possession of firearms

by convicted felons, and 18 U.S.C. § 922(o)(1), which criminalizes the possession of a

machinegun by any person.[2]  Stokes appeals, contending that the district court erred in denying his motion to suppress the firearms, which were discovered after a warrantless entry into Stokes's motel room.  As this case comes to us, the government concedes that Stokes did not consent to the search, that no arrest or search warrant had been sought, and that the warrantless entry was not otherwise justified by exigent circumstances.  The district court based its denial of Stokes's motion on the inevitable discovery doctrine, concluding that it had a "high level of confidence" that every possible course of events in the absence of the illegal entry would inevitably have led to the guns' discovery.  Because we conclude that the district court erred in its application of the inevitable discovery doctrine, we vacate the judgment of conviction, reverse the denial of the suppression motion, and remand the case for further proceedings consistent with this opinion.

## BACKGROUND

**I.      Events Prior to the Unlawful Entry**

The facts as found by the district court in denying Stokes's suppression motion are not in dispute.  In the early morning hours of June 24, 2010, Stokes and Donovan Gilliard were arguing with Kareem Porter outside the Congress Bar in Poughkeepsie, New York. As the verbal altercation escalated, Gilliard pulled a knife from his pocket, and he and Stokes chased Porter down the street.  After Porter fell to the ground, Gilliard jumped on top of him and stabbed him in the chest and torso, while Stokes punched and kicked

---

[2] Each count of the indictment also referenced 18 U.S.C. § 924(a)(2), which provides penalties for knowing violations of, *inter alia*, 18 U.S.C. §§ 922(g) and 922(o).

3

Porter in the head. Porter died from the knife wounds. The knife was recovered by the police that night, and there is no indication that any other weapons were used during the course of the homicide.

After interviewing several eyewitnesses and reviewing surveillance video, Detective Robert Perrotta, a twenty-four-year veteran of the Poughkeepsie Police Department, sought to interview Stokes and Gilliard. Perrotta had known Stokes since the mid-1990s, and had interviewed him nine months earlier during the course of another homicide investigation. Unable to locate Stokes in Poughkeepsie, Perrotta determined that Stokes had most likely left the area, possibly armed to protect himself from retaliation by Porter's associates.

Perrotta contacted Agent Sean McCluskey, his liaison with the United States Marshal Service, and provided McCluskey with Stokes's cell phone number in order to enlist the marshals' assistance in finding Stokes outside of the Poughkeepsie area. The marshals obtained a pen register and located Stokes by "pinging" his cell phone.[3] On the evening of July 11, 2010, McCluskey informed Perrotta that the marshals had traced Stokes to the Pelham Garden Motel on Gun Hill Road in the Bronx. Later that same evening, Perrotta contacted Dutchess County Assistant District Attorney Frank Chase to inform him that he planned to arrest Stokes the next morning at the motel. Perrotta also

---

[3] "Pinging" a cell phone allows officers to gather data on the phone's physical location. See United States v. Barajas, 710 F.3d 1102, 1104-05 (10th Cir. 2013) (explaining "pinging" process); United States v. Skinner, 690 F.3d 772, 778 (6th Cir. 2012).

told Chase that the marshals would prefer to have an arrest warrant in hand. Chase declined to seek an arrest warrant. The decision was strategic. Under New York law, once an arrest warrant issues, law enforcement officers are not permitted to question suspects outside of the presence of counsel. See People v. Samuels, 49 N.Y.2d 218, 223 (1980). Chase believed that if Perrotta could speak with Stokes, he "could . . . attempt to reason with . . . Stokes to cooperate in both the earlier homicide that occurred [in] September as well as the current homicide . . . of Kareem Porter." App'x 75.

## II.    The Unlawful Entry

On the morning of July 12, 2010, between twelve and fifteen law enforcement officers, including Perrotta, McCluskey, and members of the New York-New Jersey Regional Fugitive Task Force, met in a parking lot near the motel to discuss their strategy for arresting Stokes without a warrant. Perrotta gave the officers both a physical description and a photograph of Stokes, and warned them that Stokes might be armed. Perrotta and the officers proceeded to the motel. Motel staff confirmed that Stokes and a companion, Shannon Fulmes, had checked into the motel on July 9, 2010, and paid to rent a room through July 13, 2010. Motel staff then showed Perrotta where the couple's room was located and gave the detective a passkey to access the room. At that point, Perrotta again telephoned Chase in an attempt to secure an arrest warrant. Despite the fact that an arrest warrant could be quickly obtained, Chase once again refused to seek a warrant.

When the law enforcement officers realized that a warrant would not be forthcoming, they became concerned that other hotel patrons had spotted them and that

5

someone might shout "police are here," thereby alerting Stokes of the officers' presence. Perrotta, McCluskey, and several other agents moved directly to the entrance of Stokes's motel room, while the remaining officers secured the building's rear and the second-floor window of Stokes's room. When he arrived at Stokes's room, Perrotta noticed that the door was slightly ajar. Perrotta pushed the door open and, using the nicknames that he and Stokes had developed for each other during their previous interactions, said "Qua, are you in there? It's Rambo." Stokes replied, "Yo." Without seeking permission to enter, Perrotta crossed the threshold into Stokes's room with his gun drawn. Stokes, who was at the edge of his bed wearing only his underwear and a t-shirt, asked Perrotta what this was all about, and Perrotta explained that the investigation was related to the homicide that occurred near the Congress Bar. Perrotta told Stokes to get dressed because the officers were taking him back to Poughkeepsie, and reached for a pair of pants he saw lying on a bag on the floor to hand them to Stokes. Once he picked up the pants, Perrotta saw that the bag underneath the pants was open and contained a large handgun. Perrotta yelled "gun" to alert the other officers that he had found weapons. He handed McCluskey the gym bag and arrested Stokes. Officers later determined that the bag contained nine guns and accompanying ammunition.[4] After being detained at the Dutchess County Jail in

---

[4] The guns found were: (1) a MAC, M-11-type, 9mm caliber machinegun and ammunition magazine; (2) a Taurus .357 caliber revolver; (3) a Beretta .40 caliber pistol and ammunition magazine; (4) a Smith & Wesson .38 Special caliber revolver; (5) a Smith & Wesson .40 caliber pistol and ammunition magazine; (6) a Smith & Wesson .44 caliber revolver; (7) a Colt .45 caliber pistol and ammunition magazine; (8) a Glock .40 caliber pistol and ammunition magazine; and (9) another Glock .40 caliber pistol and ammunition magazine.

Poughkeepsie from July 12, 2010, until October 4, 2011, Stokes was acquitted of state charges relating to the murder of Kareem Porter.

## III.    Federal Proceedings

Stokes was subsequently arrested and charged in federal court with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and with possessing a machine gun in violation of 18 U.S.C. § 922(o)(1).  Stokes moved to suppress the firearms and ammunition based on the officers' illegal entry into his hotel room, and the district court held a hearing on January 19, 2012.  On February 3, 2012, as an exhibit to its post-hearing memorandum of law, the government submitted the affidavit of Peter Patel, the motel's manager.  The district court summarized the affidavit as follows:

> Mr. Patel affirms that he has been the manager of the Pelham Garden Motel since 2004.  In his capacity as manager, he oversees the cleaning and maintenance of the motel rooms.  Staff members enter occupied motel rooms daily to clean, and they also clean after guests vacate the rooms.  If cleaning staff find "contraband" in a motel room, Mr. Patel or other motel employees "in the ordinary course of business," turn that contraband over to law enforcement.  In fact, Mr. Patel states that in July 2010 cleaning staff found ammunition, a ring, and documents in room 57 after Defendant was arrested; he informed law enforcement that these items had been recovered.

App'x 184 (citations omitted).[5]

On March 7, 2012, the district court issued a written opinion and order denying Stokes's suppression motion.  <u>United States v. Stokes</u>, No. 11 Cr. 956 (JFK), 2012 WL

---

[5] The Patel affidavit does not state that any motel policy requires or allows motel staff to search luggage left behind by guests in order to find contraband.

752078 (S.D.N.Y. Mar. 7, 2012). A bench trial on stipulated facts followed, and the district court found Stokes guilty. On July 11, 2012, the district court sentenced Stokes to 60 months' imprisonment, followed by three years' supervised release, and imposed a mandatory $200 special assessment. Stokes timely appealed.

## DISCUSSION

To deny Stokes's suppression motion, the district court relied on the inevitable discovery doctrine, an exception to the Fourth Amendment's exclusionary rule. The government has never contended that Stokes consented to Detective Perrotta's entry into the motel room, and on appeal, has abandoned its argument that the entry into the motel room was justified by exigent circumstances. Further, Stokes does not contest the accuracy of the district court's factual findings. The sole question before us, therefore, is whether the district court properly applied the inevitable discovery rule. The correctness of the district court's application of the inevitable discovery doctrine is a mixed question of law and fact, which we review de novo. United States v. Mendez, 315 F.3d 132, 135 (2d Cir. 2002).[6] Our de novo review of this record compels the conclusion that the

---

[6] The government argues that Stokes must show that the district court's factual inferences are clearly erroneous in order to justify reversal. This misapprehends the standard of review. We have previously discussed the "semantic problems in using the preponderance of the evidence standard to prove inevitability." United States v. Cabassa, 62 F.3d 470, 474 (2d Cir. 1995). We once again note the difference between "proving by a preponderance that something would have happened and proving by a preponderance that something would inevitably have happened," id., and reiterate that appellate courts review de novo the district court's *application* of the inevitable discovery doctrine. Cf. Ornelas v. United States, 517 U.S. 690, 696-99 (1996) (holding that lower court determinations of reasonable suspicion and probable cause are mixed questions of law and fact that appellate courts should review de novo); accord Mendez, 315 F.3d at 135.

8

district court erred by failing to suppress the weapons at issue in this case.

## I.       **The Exclusionary Rule**

The Fourth Amendment protects the "right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures," and

warrantless searches inside a home are "presumptively unreasonable," Kentucky v. King,

131 S. Ct. 1849, 1856 (2011). These fundamental protections apply with equal force to

persons staying in motel rooms. See United States v. Moran Vargas, 376 F.3d 112, 115

n.1 (2d Cir. 2004) ("A person staying in a motel room has the same constitutional

protection against unreasonable searches of that room as someone in his or her own

home."); United States v. Mankani, 738 F.2d 538, 544 (2d Cir. 1984).[7] To "safeguard

Fourth Amendment rights generally," Herring v. United States, 555 U.S. 135, 139-40

(2009) (internal quotation marks omitted), the Supreme Court has crafted the

exclusionary rule, requiring the exclusion of evidence "[w]hen the police exhibit

deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights," Davis

v. United States, 131 S. Ct. 2419, 2427 (2011) (internal quotation marks omitted). "[A]n

assessment of the flagrancy of the police misconduct constitutes an important step in the

calculus of applying the exclusionary rule." Herring, 555 U.S. at 143 (2009) (internal

quotation marks omitted).

---

[7] Hotel guests retain a legitimate expectation of privacy in the hotel room and in any articles located in their hotel room for the duration of their rental period. Cf. United States v. Rahme, 813 F.2d 31, 34 (2d Cir. 1987) ("[W]hen a hotel guest's rental period has expired or been lawfully terminated, the guest does not have a legitimate expectation of privacy in the hotel room or in any articles contained therein of which the hotel lawfully takes possession.").

In this case, such an assessment reveals that law enforcement personnel made a deliberate decision to violate constitutional requirements. We assume that the officers had probable cause to arrest Stokes for participation in the murder of Porter. While such probable cause would have permitted them to arrest Stokes without a warrant had they encountered him in a public place, it has long been established that an entry into protected premises in order to search for or arrest a suspect requires an arrest or search warrant. Payton v. New York, 445 U.S. 573, 587-88 (1980). There is little doubt that a warrant could have been obtained. Nevertheless, Assistant District Attorney Chase made a deliberate strategic choice to have the officers attempt to arrest Stokes without a warrant, in order to question Stokes outside of the presence of counsel. Detective Perrotta testified that he was familiar with this rule and knew that he needed a warrant or consent to enter Stokes's room. Despite this knowledge, however, rather than waiting for Stokes to leave the motel room, or seeking consent to enter, or attempting a ruse in an effort to lure Stokes out of the room, he deliberately entered the motel room without a warrant or consent. That deliberate, tactical choice to violate Stokes's constitutional rights was "sufficiently deliberate that exclusion [could] meaningfully deter it," Herring, 555 U.S. at 144. We have no doubt that the exclusion of evidence is presumptively appropriate in such a clear case of illegal police action.

## II.    The Inevitable Discovery Doctrine

The exclusionary rule is not without exceptions, however. One such exception – the inevitable discovery doctrine – provides that the fruits of an illegal search or seizure

10

are nevertheless admissible at trial "if the government can prove that the evidence would have been obtained inevitably without the constitutional violation." United States v. Heath, 455 F.3d 52, 55 (2d Cir. 2006) (internal quotation marks omitted). The government bears the burden of proving inevitable discovery by a preponderance of the evidence. Nix v. Williams, 467 U.S. 431, 444 (1984); United States v. Cabassa, 62 F.3d 470, 472-73 (2d Cir. 1995). We have made clear, however, that "proof of inevitable discovery 'involves no speculative elements but focuses on *demonstrated historical facts capable of ready verification or impeachment*,'" United States v. Eng, 971 F.2d 854, 859 (2d Cir. 1992), quoting Nix, 467 U.S. at 444 n.5 (emphasis in Eng). The focus on demonstrated historical facts keeps speculation to a minimum, by requiring the "district court to determine, viewing affairs as they existed at the instant before the unlawful search occurred, what *would have happened* had the unlawful search never occurred." Id. at 861 (emphasis in original). Evidence should not be admitted, therefore, unless a court "can find, with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor." Heath, 455 F.3d at 60; see also id. ("Under the inevitable discovery exception, unlawfully seized evidence is admissible if there is *no doubt* that the police would have lawfully discovered the evidence later."), quoting United States v. Romero, 692 F.2d 699, 704 (10th Cir. 1982) (emphasis in Heath); United States v. Roberts, 852 F.2d 671, 676 (2d Cir. 1988) (holding that the issuance of a subpoena may not "inevitably result[] in the discovery of . . . suppressed documents" because several contingencies may not have been resolved in the government's favor).

11

This Court's cases illustrate the practical application of these standards. In Cabassa, a team of DEA agents surrounded a building, while another group of officers went to the U.S. Attorney's office to obtain a search warrant for an apartment in the building that was an alleged drug house. 62 F.3d at 471-72. Before receiving any news about the warrant, officers forced their way into the apartment, where they found drugs and other evidence. Id. at 472. The district court found that there was no exigency justifying the search, but determined that the evidence would inevitably have been discovered because the search warrant would have issued. Id.

We reversed, noting that several contingencies might not have been resolved in the government's favor. First, the government never obtained a warrant, and there was a "residual possibility that a magistrate would have required a stronger showing of probable cause," id. at 474, and thus might not have issued the warrant. Second, we were unable to determine with "any certainty how much time would have been taken to complete the application, to submit it to the magistrate judge for consideration, and to secure the warrant's issuance." Id. Thus, the agents might have been detected and the evidence might have disappeared before the warrant issued. Id. That both contingencies existed, and that both scenarios were susceptible to factual error, "undermine[d] the conclusion that discovery of the evidence pursuant to a lawful search was inevitable." Id.

Similarly, in Heath, law enforcement officials executed a search warrant, which had issued on the basis of reports that cocaine was being sold at the address. 455 F.3d at 53. The warrant did not authorize any arrests or suggest the involvement of any specific

12

individuals.  Id.  The officers found Heath in the same room as a small, concealed quantity of narcotics and placed him under arrest.  Id. at 54.  A search incident to that arrest revealed $3,073 in cash on Heath's person.  Heath moved to suppress the seized currency.  The magistrate judge determined that the currency was not admissible under the inevitable discovery doctrine.  The district court agreed and suppressed the evidence. Id. at 54.  In determining the government's interlocutory appeal from the district court's decision to suppress the currency, we assumed *arguendo* that Heath's proximity to the narcotics was not a sufficient reason to justify his arrest, and remanded the case to the district court for further findings to determine whether "a sufficient reason to justify the arrest . . . became evident a few moments later . . . . [and] whether the relevant officers would have acted on that reason, and would then have arrested Heath, thereby bringing the inevitable discovery doctrine into play."  Id. at 55.  We emphasized that "the inevitable discovery doctrine is available only where there is a high level of confidence that *each* of the contingencies required for the discovery of the disputed evidence would in fact have occurred."  Id. (emphasis added).  The record then before us only demonstrated that a reasonable police officer *could have* arrested Heath, not that a reasonable officer *would have* made the arrest, and we made clear that resolution of the latter contingency in the government's favor was necessary to support an inevitable discovery finding.  Id.

Here, as in Cabassa and Heath, we find that the district court erred in determining that the record supports a finding that the evidence at issue would inevitably have been

13

discovered. The district court determined that "the only *real* contingency that would have had to occur in order for law enforcement to discover the firearms was for Defendant to leave his motel room with the guns." Stokes, 2012 WL 752078, at *7 (emphasis added). Because Stokes was due to check out of the room on July 13, 2010, the district court reasoned that Stokes's departure "had to occur with certainty within 24 hours of the warrantless search," but may have also occurred earlier if Stokes "left the room for food, an early check-out, or any number of other reasons." Id. From that point, the district court saw "two potential avenues to inevitable discovery, either of which would have a high probability of recovering the firearms." Id. First, Stokes might have left the room "with[] one or more weapons on his person for protection," or "holding the bag of guns," at which time Perrotta would have "performed a search incident to . . . lawful arrest . . . or . . . an inventory search," and found the weapons. Id. Second, if Stokes left the bag in his room, "then cleaning staff would have found the open bag of firearms . . . [and] Mr. Patel, in the ordinary course of business, would have turned the firearms over to law enforcement." Id. at *8. Accordingly, the district court found by a "preponderance of the evidence that the bag of firearms and ammunition would have been discovered even if Detective Perrotta had never set foot" in Stokes's motel room. Id.

The district court's inevitable discovery analysis was erroneous in several respects, and we hold that the government has failed to prove by a preponderance of the evidence that the guns and ammunition would inevitably have been discovered. First, the district court, "focus[ing] on demonstrated historical facts," Nix, 467 U.S. at 444 n.5, must

14

determine, with a "high level of confidence, that *each* of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor," Heath, 455 F.3d at 60 (emphasis added). Here, the district court, finding that there was only one real contingency in this case, failed to account for all of the demonstrated historical facts in the record, and in doing so, failed adequately to consider other plausible contingencies that might not have resulted in the guns' discovery.

Stokes was not the only guest registered to the motel room; his companion Fulmes was also a paid registered guest. Stokes and Fulmes were registered until July 13. Any number of contingencies could have occurred between the time that Perrotta entered the room and the couple's scheduled departure.[8] For example, Fulmes might have returned to the room and left carrying the gun bag; the officers would have had no basis for arresting or searching her. Alternatively, as the district court noted, Stokes might have left the room to get food or for some other reason, but left the guns in the room. In that event, the officers would presumably have arrested him, but would have had no basis for searching the room without a warrant. Fulmes would still have had the opportunity to return, check out in the normal course, and remove any of her or Stokes's belongings. The district court dismissed this latter possibility, stating that it was "not one that is supported by the evidence." Stokes, 2012 WL 752078, at *8. But it is a matter of demonstrated historical

_____

[8] The record does not indicate the precise time that the couple's rental period expired on July 13, but it is reasonable to assume, as the district court did, that they had the right to occupy the room for at least another 24 hours after Perrotta entered the hotel room at around 10:30 a.m. on July 12.

fact that Fulmes was a registered guest in the room, and that she retained a legitimate expectation of privacy in the room and the articles contained therein until the expiration of the rental period. Cf. Rahme, 813 F.2d at 34. A court may only speculate about the likelihood that she would have returned and removed the guns, but that is precisely the problem: a finding of "inevitable" discovery cannot rest on speculation about what Fulmes might or might not have done.

Second, the district court, placing significant emphasis on the Patel Affidavit, determined that if Stokes had been arrested outside the room, but without the guns, there was "no doubt that Mr. Patel, in the ordinary course of business, would have turned the firearms over to law enforcement." Stokes, 2012 WL 752078, at *8. On this record, we cannot conclude with a high degree of confidence that this contingency would have been resolved in the government's favor. Even putting aside the possibility that Fulmes would have retrieved the firearms, for example, Stokes might have zipped the bag and placed it in a closet before leaving the room, which might well have prevented the guns from being discovered. It is hardly *inevitable* that Stokes would have left the guns in an open bag in plain view had he chosen to leave the room on some errand. The Patel Affidavit merely indicates that the motel has a policy of entering rooms to clean them after tenants "check out or otherwise cease their stay," and that Patel, in the ordinary course of business then "notif[ies]" law enforcement if any contraband is discovered. App'x 139. While the government contends that "[c]ommon sense dictates that in order to determine whether an abandoned container should be discarded, turned over to the police, or kept for some

16

period of time for retrieval, the staff would open it to determine what is inside," nothing in the Patel Affidavit indicates that motel staff routinely open luggage left behind in guest rooms in order to search for contraband, or that motel staff have a practice of discarding forgotten luggage. Moreover, "we can deplore but not ignore the possibility" that if motel employees had found the guns, they might nevertheless have failed to report their discovery, and appropriated the valuable property for their own purposes. See Roberts, 852 F.2d at 676.

Third, we note that unlike the more typical application of the inevitable discovery rule, in which the government seeks to invoke the doctrine on the basis of standardized, established procedures such as those requiring inventory searches, see, e.g., Mendez, 315 F.3d at 137-38, or on the basis of an investigation that was already underway, see, e.g., Nix, 467 U.S. at 448-50, the district court's inevitability analysis in this case is predicated on an assessment of the actions that might have been taken by third parties – Stokes, Fulmes, or motel staff – not acting at the behest of the police. Such an analysis is inherently speculative, and the district court's conclusions were not based on "demonstrated historical facts capable of ready verification." Id. at 444 n.5.

Finally, the government points to the fact that motel staff notified law enforcement about a ring, documents, and ammunition that had been found in Stokes's room after his arrest as further support for the district court's inevitable discovery analysis. This argument assumes, however, without any basis in the record, that in the ordinary course of business, motel staff would report to law enforcement officials every item that was

17

found in a guest's room.  Here, the demonstrated historical facts make plain that law enforcement officials notified the motel staff that they were looking for Stokes, and that motel staff, who provided Perrotta with a key to Stokes's room, were aware that Stokes had been arrested by the twelve to fifteen officers who gathered outside of the motel room.  While the district court may have had "no doubt" that the motel manager would have decided to notify law enforcement officials of every item found in Stokes's room, it is speculative, at best, to suggest that such a decision occurs during the ordinary course of business.  To the contrary, Patel's affidavit indicates that the ordinary policy is to notify the police of any contraband that is discovered during a routine cleaning of a room after the guest's departure.  It does not suggest that *all* property left behind by a guest is turned over to the police, or that closed containers are routinely searched for contraband.

In short, on de novo review, we conclude that the sheer number of contingencies that may not have been resolved in the government's favor "undermines the conclusion that discovery of the evidence pursuant to a lawful search was inevitable," Cabassa, 62 F.3d at 474.  At bottom, the government's argument amounts to little more than a contention that the officers were "not leaving the motel without Stokes."  That the officers would not leave the motel without arresting Stokes, however, does not compel the conclusion that the officers would inevitably have discovered the guns.

## CONCLUSION

For the foregoing reasons, we VACATE appellant's conviction, REVERSE the denial of the suppression motion, and REMAND the case for further proceedings.

18